Good morning. May it please the Court, Joseph Siguenza for Petitioner. If I may, Your Honors, Petitioner submits this morning for the Court's consideration the following issue, and this relates to Counselor, do I have the wrong? I have Mr. Bakri. He is my associate. I see. Okay. Thank you. We had the wrong name on the. Could you tell us your name again, please? Certainly, Joseph Siguenza, S-I-G-U-E-N-Z-A. Thank you. Thank you. The issue that Petitioner presents for the Court's consideration this morning relates to the IJ's adverse credibility findings and denial of asylum and withholding of removal. Could you speak up just a little bit? Certainly, Your Honor. Specifically, were the IJ's adverse credibility findings supported by substantial evidence in the record? Petitioner would submit that they are not, that, in fact, the adverse credibility finding was based on unsupported assumptions or personal opinions of the IJ and nonissues, and that these were improper as a basis for the adverse credibility finding. Specifically, Petitioner points to two issues upon which the IJ based her adverse credibility finding. The first issue relates to, and this is at A.R. 95, the 1992 rescheduled election, both national and local, and the IJ's concern as to respond to Petitioner's testimony as to who, in fact, voted in that election. On direct exam, Petitioner, according to the IJ, testified that from his party, quote, everyone voted all over India in this particular election. On cross-examination, Petitioner, though, corrected himself and that's – and said that from his home state in Delhi that everyone participated in the election, or rather voted, and it was only in the state of Punjab that the election had been boycotted. So his correction is all over India except Punjab. Exactly. Exactly. Specifically in Delhi, which is where he was. He voted in Delhi, but previously he didn't say my party recommended that we vote in Delhi, all over India. Correct. Correct. So we've got to do something with the all over India, and maybe that something is all over India except, of course, Punjab. In the state of Punjab, yes. Where everybody knows there was a boycott. Yes. I added a few words, I have to say. All right. And the IJ based her adverse credibility finding on that inconsistency. Petitioner submits that he did correct his testimony and that it was totally proper for him to correct his testimony on cross-examination and clarify for the IJ what he meant by his earlier testimony. Counsel, what are we to do with the fact that you characterize it as correcting his testimony, but given the fact that we have to find that no reasonable fact finder could have found otherwise, can't it also be susceptible of just the opposite conclusion, that that is, in fact, an impeaching admission by your client on cross-examination, which is what cross-examination is designed to elicit? Certainly, Your Honor. Petitioner would respectfully disagree that it is an impeaching statement on direct and cross. However, if the Court were to conclude that it was an impeaching statement, Petitioner would submit that it's collateral impeachment at best. It's minimal impeachment. And it doesn't go to the heart of his claim. The claim that he was, in fact, arrested because of his political involvement with the Akali Dalmayan, that he was physically mistreated by the police on two occasions, two arrests, rather, and that he did suffer serious injury, and that his arrest because of his political opinion entitled him to a grant of asylum or withholding or removal. The second issue that the IJA appeared to concentrate on as the basis for her adverse credibility finding was a gathering that Petitioner testified on direct exam he was that I believe occurred in 1984. And this planning meeting, according to Petitioner, occurred in 1995. Admittedly, on direct examination, Petitioner used various words to describe this gathering. I believe he used the word, initially, demonstration at AR-108, and at 157, used the words, quote, get together, and at 158, used the words, people collect in front of the temple. The IJA at AR-157, Petitioner submits, erroneously alleged that he used the word, quote, rally on direct examination, when, in fact, he did not. Petitioner actually used the word, quote, demonstration, and that's at AR-108. In any event, the IJA's concerns that he used different words to describe this gathering or planning meeting to commemorate the Golden Temple Massacre is not the real issue here that we would submit. The real issue is, was there a planning meeting that Petitioner was involved with and organized? Was he arrested? Did he suffer torture at the hands of the police after the arrest? And was he injured? The answer to those questions is yes. It's of interest to note that the material aspects of his claim, that he was politically involved, that he was arrested, tortured, and was injured because of his political opinion, were not challenged by either the government or the IJA. He testified credibly and in detail and plausibly as to his arrests. The, for instance, I believe his testimony as to his arrest and his treatment of the police were very detailed. We have 107 pages of testimony here. A review of the record shows that his testimony on direct and cross regarding his arrest and his treatment was without hesitation, without pause, and was very long and detailed. That is the heart of or the material aspect of his claim that we believe should be focused upon and not assumptions or personal opinions of the IJA on which he based her negative or adverse credibility findings. Counsel, you just made a statement, and I'm wondering maybe you could tell us, tell me a little bit about what the typical practice is in an IJA proceeding. You said that his answers were without pause. Yes. It's been my experience that one of the biggest problems with a cold record is that we don't measure the time between when the question was asked and when the witness supplies the answers. Do the IJAs typically speak for the record and note that the witness just took 10 seconds to answer, or are we just left with your representation that it just didn't happen in this hearing? Granted, you're left with my representation, Your Honor. The record is, does not reflect that. But I believe on occasion IJAs, if they find credibility or not credibility, they will comment on whether the Respondent's answers were without hesitation or without pause. In the same conclusory fashion that you just gave. Exactly. All right. The personal assumptions or the personal opinions that we believe the IJA relied upon, which were erroneous to base an adverse credibility finding, included the following, if I may. At AR-64, she contended that Petitioner consulted on a break with somebody between his direct and cross-examination testimony about the voting in 1992, which we've referred to, and that at AR-65, the police were after party leadership and not the rank-and-file members, should have been after party leadership and not after rank-and-file members such as Petitioner. We would submit that speculation as to police motives as to why they might have arrested him rather than going after rank-and-file higher-ups in the party. Can I ask you about, there seems to have been some notion that if there was going to be some sort of a gathering or demonstration or whatever the right word is to commemorate the Golden Temple in 1884, it should have been in 94 rather than in 95, and the very choice of the date of 95 makes that somewhat implausible. Could you respond to that? Admittedly, Your Honor, the record does reflect that the IJA had concern whether or not, you know, why the 10-year anniversary I believe was in 1994, as the Court has pointed out. And why would there be a commemoration in 1995? I don't believe that there was evidence developed either way on that on the record, so to draw a conclusion as to why or why not this gathering was planned for 1995, there's no evidence either way in the record. Let me go back to something else that you said, too. You indicated that the IJA had mentioned there was some concern based on a break that had occurred during the testimony where he went out, conferred with somebody in the hall, then came back in and gave perhaps a slightly different version. Correct. Is it improper for the factfinder to make note of the fact that as a result of a break during the proceedings, a witness comes back in after being coached at the break and gives a different version of the testimony than he or she gave before the break? No. We would admit it's not improper per se, but, however, it should be noted on the record that the IJA also said that I don't know if specific conversations were had outside and with whom. She assumed that on the break that Petitioner spoke with somebody, and that was the reason for the change in testimony. Just finally, Your Honor, at AR-67, the IJA's concern or personal assumption or conclusion that the doctor should have included the cause of injuries in the medical document is improper. It's what I think is the key here. Again, did Petitioner testify credibly and consistently that he was injured as a result of mistreatment by the police after his arrest? Yes. And that the injuries were addressed in the medical document. The cause of injury, we submit, is not as important per se as corroborating that, in fact, he was injured. He sought medical treatment. Now, you're running over. Certainly. I'm going to save a minute for you. Despite that, I think we'd better stop now. Thank you. So you'll get a minute on rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Norah Oscoli Shores for Respondent, John Ashcroft. This case is purely a case of credibility. Petitioner's claim in this case is not credible, not only because his testimony was inconsistent and implausible, but it was completely undermined by the State Department reports. Gonzalez-Hernandez teaches us that even ambiguous country reports, if analyzed properly for a specific case, provide substantial evidence for a decision. In this case, the country reports are completely unambiguous and consistent with the findings in Mali that even true Sikhs who live outside the Punjab need not fear harm. This Petitioner is outside the Punjab. Nothing he – none of the harm he claims to have come to occurred within the Punjab. State Department reports are very clear that these instances are extremely rare and pretty much unknown outside the Punjab. And is the State Department report that you're relying on in the record? I beg your pardon? Is the State Department report that you are relying on in the record in this case? Absolutely, Your Honor. Where in the record, then, are you – and what part of that report? I'd like to just be able to read it with you. Well, we would be – refer you to – let's see. Actually, my colleague who wrote the brief was very, very specific. Okay. And I would refer you to the red brief on pages 15 through 16, where he goes through and cites to the specific pages in the record. Okay. And where – if you could just tell me what pages in the record, because I've got the record here and I'd like to read it. 230 to 47. Hang on. 230 to 47? Mm-hmm. 200 – 182 to 183. Wait a minute. Wait a minute. You do that for me. 182 to 3. Newspaper. No. I'm just getting – so far, I'm just getting newspapers. Please forgive me, but I can – it would be – my colleague did a brilliant job summarizing on page 15 of the brief, which will have all these specific record sites. Okay. If you don't have them, we can – we'll figure it out. Oh, no, no. I mean, I can continue. Yeah, I'm interested, because if you could just find me the State Department report to which you made specific reference. That's what I want. Okay. Look through 182 to 183. Okay. Those are newspapers. Okay. Well, they support what the State Department said as well. But I'm asking specifically for the report. Okay. 193. 193. And 194. Okay. Hang there. We may be making – we may be getting somewhere. Okay. Hang on a second. And he also has the line 193. He has paragraphs of that. Okay. This is a State Department report prepared in June of 1996. Right. Which – and it covers the time period of which – And the relevant pages I'm supposed to be focusing on within this report are – The specific quote is, genuine Sikhs rarely – Okay. And what page are you reading from? 193. 193. Okay. Sikhs rarely encounter serious difficulties with the authorities if they live outside the Punjab. And what paragraph is this? He has 62. 62. Or line 62. Sikhs resident outside Punjab rarely experience serious difficulties either with the authorities or with members of other religious community. Got it. Thank you. Thank you, Your Honor. You might want to hang on to that section. I'm going to make more of this. I'm dog-eared. Okay. And Mali – but this Court found that also in Mali, which was recently decided, which I provided a copy to opposing counsel, where it acknowledges that there are – Sikhs do not experience problems outside the Punjab generally. According to the country reports – now, Petitioner is from Delhi. According to the country reports, a six-month investigation of claims from New Delhi revealed fraud in 100 percent of the claims filed from that area. And the report – Is that report also in the record? Yes. Okay. And if you'll – if it's okay with you, can I submit a list to you and opposing counsel of the pages, rather than taking up my time during argument? Well, I'll let you run – I'll let you run over it. Because that's an interesting point to me, if you could find that. Okay. Oh. Okay. Okay. 193, line 58. 193, paragraph 58. State Department expressed concern about certain patterns in asylum applications filed by natives of India. Pointed out that while Sikhs comprise only 2 percent of the national population, approximately 65 of Indian asylum applications claim to be Sikhs. Some non-Sikhs have tried to make use of the unrest in human rights violations in the Punjab for their own purpose by attempting to pose as Sikhs who have been abused by Indian authorities. I'm sorry. Are you on page 193 of that? 193. And paragraph – what paragraph? 5960. 5960. I'm sorry. Okay. Reported that INS officers stationed in New Delhi conducted a six-month investigation of asylum cases and that every case examined involved fraudulent claims. In that context, we have a gentleman living outside the Punjab who claims that he has been persecuted on account of his Sikh activities. The State Department also further says that persons who genuinely have a basis to make this claim, they would know two things. We should look for two things. One is they will know about that 1991 election that was aborted and that was actually held in 1992. They would know about the boycott. And as the immigration judge observed, Petitioner said one thing on direct, took a break. She did not say that he consulted with anyone. She said he met with other people, his attorney and a friend of his, came back and his testimony changed. State Department said he should know. State Department said you should also look for Sikhs if they are genuine Sikhs to observe the customs. This man has been clean-shaven since 1984 and continues to be clean-shaven today. He says that it's to avoid problems, again, outside the Punjab where they are not reported to occur. And yet he claims to have stood on street corners in the middle of the plaza distributing leaflets, pro-Sikh activity leaflets. So we have inconsistencies and implausibilities here just in the basis. He has not grown his hair since he came to the United States because he has gray hair and he doesn't want it to show. This is not the – all the red flags that the State Department identified are raised in this case. So in the context of the State Department reports, it's implausible. And the State Department reports are to be given weight. And I gather from this that he's not wearing a turban. He's not wearing – well, no. You've seen the picture is in the passport. Right. He's clean-shaven. Well, he has a mustache. So in this context, we look for particularly clear, consistent evidence, and it's not here. The employment history is inconsistent. He says he's self-employed and yet he said he worked for the same company for 11 years. The other – and as Your Honor pointed out, the Golden Temple Massacre occurred in 1984. There were demonstrations throughout the country on the 19 – on the 10th anniversary. Nothing happened to Petitioner or anybody in his little group. And it is a small group. We're talking about seven or eight people and the President. Was there anything in the record that there were 10th anniversary demonstrations or was that just the I.J.'s assumption? It was mentioned in the State Department reports. Please don't ask me for the details. Okay. You'll be okay. It was mentioned. And they went by and large peacefully and certainly there was no problem in Delhi. And again, he's one of seven or eight people. This is his group. So he is asking us to believe that he was tortured mercilessly as a result of planning a demonstration for the 11th anniversary. When the 10th anniversary celebrations or memorials went ahead without a hitch, no one was arrested at the demonstration which actually took place while he claims he was tortured for having planned it. He doesn't explain how anyone knew he had planned it. I mean, it happened in his house. And nobody got arrested when they demonstrated, yet he is just subjected to this dreadful torture which he describes. And it doesn't make sense. And again, in context of the State Department reports which are uncontested, it's very highly implausible. It's unbelievable. It is not supported by the record. And a contrary conclusion that he is actually telling the truth is not compelled by this record, by his testimony, by his evidence. And then he says he was afraid to stay at home, so he went to work on a big farm and he stayed there for three months in another part of the country and then he was afraid that people started recognizing him. He doesn't claim to have been a national leader. In fact, he claims he was punished because he wasn't. How could anyone recognize him on a farm? So he moved around from place to place for a while. And then we have the old, you know, everybody is still looking for me. But nothing is corroborated here. Nothing is plausible. And it's not consistent with the State Department reports, with the history, with the political situation in India. Can you answer a question for me? Please. It's tangential because it doesn't get argued. But we used to have doctrine, and it was regularly resorted to by the government, that persecution had to be countrywide. In other words, your fear, you know, if you were likely to be persecuted in a small part of the country, that wasn't enough for asylum. And then I believe maybe we had a case, in fact, involving India, where we backed off from that. Can you tell me what the ---- I believe so. We have, it becomes a little bit more relevant when past persecution has been established. And then, and that's in the regs, that you have to, then the burden of proof changes to the government that he can live elsewhere safely. We're not ---- So we're focusing on past persecution. Exactly. Because it didn't occur here, because we can't believe that any of this happened because he, we can't believe anything he says, because nothing he says is consistent with the country reports. Let me take a moment to address the corroboration, if that's of concern to this Court. I delayed you considerably. Go ahead, please. Thank you, Your Honor. I should have known it better. The fact is, the documents came in. While it's understandable that someone wants to call and back up his claim with letters, these letters in this case did not help him. They were not contemporaneous documents. I mean, there's no problem with his calling his dad and saying, by the way, look, you know, help me out here, get me some documents. But all of them were dated and created in response to this request. He has a document dated 1997 documenting his membership in a party since 1992. But they didn't send us a copy of his membership from 1992. The doctors who submitted medical records, they were all dated 1997, saying I treated him then. You know, dad asked me to say this. But they didn't send a copy of the medical treatment. They might have kept records, but the point is it's not in tight ---- we don't have to disbelieve it. And we should credit him for trying to document it. But in this case, they don't help his claim. And his dad also did the same thing. Well, this is what happened, you know, when I went to pick him up, and this is what happened to him. But they're all very general, very ---- and specific only that they were in response to his request. Then finally, he says another major impossibility which troubled the immigration judge, and rightfully so, was that he said, I was arrested because they didn't want to arrest the leader. The leader was the one who came and got his ---- obtained his release both times and his father's. But we are talking about a local leader who led seven people. He's saying they're afraid to arrest the big leaders because there will be a huge demonstration. But they arrest big leaders there. And this guy wasn't one of them. Neither of them were. And, well, I think you want me to sum up, basically. Yeah. The part you're going over, I think, we are not familiar with. Thank you, Your Honor. Basically, this is ---- the standard of review is extremely narrow. You have to see is a contrary conclusion compelled. This record supports and essentially compels only the conclusion that the immigration judge reached. Thank you, Your Honors. Do you want a minute? Yes, Your Honor. Very briefly, to address a couple of points that counsel had raised. It's of interest to note and significant to note, Petitioner contends, that he was not persecuted because of the fact that he was a Sikh. He was persecuted because of his political opinion, his political involvement, separate category. So whether or not he was clean-shaven or he observed the five Ks or whether he was a baptized Sikh or a non-baptized Sikh, we think it's collateral to the issues today. What's important is that Petitioner has contended in testimony and through documentary evidence, evidence, rather, that because of his political opinion and involvement with the Khalid al-Man, he ran into problems with the police. With respect to the documents that were produced in 1997, admittedly, they were obtained after the effect of his arrest and his experiences, but I believe it's precedent in this Court that they ---- that an I.I.J. should not wholesale disregard documents that were not obtained nearer or closer to the time in question, the event in question, rather. Petitioner submits that a proper foundation was laid for the three primary documents submitted in support of his claim, including the father's affidavit, medical documentation, and a letter from the Khalid al-Man. Thank you very much. Thank you. Again, thank both counsel for a very helpful argument. Thank you both. The case of Charanjit Singh Rehal v. Ashcroft is now submitted.
judges: Canby, W. Fletcher, Tallman